### UNITED STATES v. ROWE et al.
### No. 276.

Circuit Court of Appeals, Second Circuit.
March 14, 1932.

Theodore R. Jaffe, of New York City (Jeremiah A. O'Leary, of New York City, of counsel), for appellant Lyons.

Myers, Treanor & Keating, of New York City (John Caldwell Myers and John F. Keating, both of New York City, of counsel), for appellant Collins.

Du Bois J. Gillette, of New York City (Benjamin Eisler, of New York City, of counsel), for appellant Rowe.

George Z. Medalie, U. S. Atty., of New York City (Hubert T. Delany, Curtiss E. Frank, and Anthony M. Maoriello, Asst. U. S. Attys., all of New York City, of counsel), for the United States.

Before L. HAND, SWAN, and CHASE, Circuit Judges.

L. HAND, Circuit Judge.

The indictment laid the scheme and conspiracy—for there is no substantial difference between the two when more than one are involved—as follows. Lyons and one Jerome Collins organized two corporations which they called Bureaus, by which through the press and by emissaries they got in touch with persons who had lost money in stocks, and who had, or thought they had, claims against the sellers. They told the claimants that they could secure for them a settlement of their demands, and procured confederates to appear as the sellers and offer to convey lots of land to them in compromise. In these negotiations they attributed a higher value to the lots than they believed them to have, and said that they could sell them in a short time at an increased price, knowing they could not. By these deceits they got the claimants to pay to them the difference between the false value of the lots and the amount of their claims. All this was a deliberately planned scheme to defraud; the lots were of little value; they had not in fact approached the sellers; the supposititious sellers were not real. Rowe and Michael Collins were confederates who assisted in the sale of the lots. The proof came chiefly from one Kliefeld, another confederate, though not indicted; he was corroborated by a number of those practiced upon. The substance of the charges were proved beyond question and the case should clearly have gone to the jury, so that the only questions which can arise upon the appeals are those touching the indictment and the regularity of the trial.

The first is of a variance. Evidence was admitted that part of the plan was to tell the claimants that there were mortgages upon the lots, which it was necessary to release. Though there were in fact such mortgages, the defendants represented them as greater than they were, and required of the claimants a larger amount than was necessary for the releases. This was not laid in the indictment, and is the variance alleged. Literally it was; the evidence cannot be defended on the theory that it merely proved intent, and was competent because collateral transactions may be admitted upon that issue, as in cases of receiving stolen goods. The deceit as to the mortgages was a part of the scheme, though not as laid in the indictment, a term of the actual criminal agreement; and the proof varied from the charge pro tanto. But such variances have long been disregarded in trials for conspiracy, though apparently pleaders still try to fend against them by

alleging that the details specified were only "part of the scheme"; which would not serve if the point were a good one, since defendants are entitled to a true statement of the agreement. The answer is that as to the conspiracy a strict correspondence between pleading and proof is not required [Schouweiler v. U. S., 27 F.(2d) 515 (C. C. A. 9); Shepard v. U. S., 236 F. 73, 81, 82 (C. C. A. 8); Kepl v. U. S., 299 F. 590 (C. C. A. 9)]; and indeed in modern times variances are in general disregarded which do not mislead the defense [Meyers v. U. S., 3 F.(2d) 379 (C. C. A. 2); Sotorios Targakis v. U. S., 12 F.(2d) 498 (C. C. A. 5)]. This was such a case.

■ The indictment is itself challenged, because as part of the fraud, it laid promises to procure sales of the lots at an advance. The objection is ill taken. Promises, if made without intent to perform, have for long been regarded as frauds in such prosecutions. Durland v. U. S., 161 U. S. 306, 313, 16 S. Ct. 508, 40 L. Ed. 709; United States v. Comyns, 248 U. S. 349, 39 S. Ct. 98, 63 L. Ed. 287; Bentel v. U. S., 13 F.(2d) 327 (C. C. A. 2); Knickerbocker Merchandising Co. v. U. S., 13 F.(2d) 544 (C. C. A. 2); Van Riper v. U. S., 13 F.(2d) 961 (C. C. A. 2). The same is true as to false representations of value made with fraudulent intent. Southern Trust Co. v. Lucas, 245 F. 286 (C. C. A. 8); Taylor v. Burr Printing Co., 26 F.(2d) 331 (C. C. A. 2); Gardiner v. Equitable, etc., Corp., 294 F. 496 (C. C. A. 2); Byers v. Federal Land Co., 3 F.(2d) 9, 11 (C. C. A. 8); Keller v. Ley, 49 F.(2d) 872 (C. C. A. 1). True, the law still recognizes that in bargaining parties will puff their wares in terms which neither side means seriously, and which either so takes at his peril (Vulcan Co. v. Simmons, 248 F. 853 [C. C. A. 2]); but it is no longer law that declarations of value can never be a fraud. Like other words, they get their color from their setting, and mean one thing when exchanged between traders, and another when uttered by a broker to his customer. Values are facts as much as anything else; they forecast the present opinions of possible buyers and sellers, and concern existing, though inaccessible, facts. Such latitude as the law accords utterances about them, depends upon the hearer's knowledge that the utterer expects him to use his own wits; and while it may once have been true that one might safely use them to stuff any gull one brought to hand, liability has expanded as the law has become more tender towards credulity. The defendants at bar inveigled their victims into a position of confidence by pretending that they would collect their claims, and offering them a settlement which they recommended as advisers. The game was enticed into the trap by dangling the hope of profit. A jury alone could say whether in such a setting the hearer ought to have understood that the utterances were not to be taken at their face; had we been upon the panel, we should not have hesitated to find as they did. The rule is no different in criminal causes from civil.

■ The indictment did not allege that the claimants suffered any loss. In Miller v. U. S. (C. C. A.) 174 F. 35, the Seventh circuit held the defect fatal, but it has since changed its ruling [Moore v. U. S. (C. C. A.) 2 F. (2d) 839], because of the amendment to the statute made in 1909 (Criminal Code § 215 [18 USCA § 338]). We need not consider whether this required the change, for we have never accepted the doctrine (Wilson v. U. S., 190 F. 427); nor has the Eighth circuit [Cowl v. U. S. (C. C. A.) 35 F.(2d) 794]. Cf. United States v. Hersey (D. C.) 288 F. 852. Civilly of course the action would fail without proof of damage, but that has no application to criminal liability. A man is none the less cheated out of his property, when he is induced to part with it by fraud, because he gets a quid pro quo of equal value. It may be impossible to measure his loss by the gross scales available to a court, but he has suffered a wrong; he has lost his chance to bargain with the facts before him. That is the evil against which the statute is directed.

■ Coming to the conduct of the trial, the defendants complain of the charge upon the question of fraud, especially in relation to value, and the promise to sell the lots quickly. In substance what the judge said was that while the defendants might buy and sell land at their own price, they might not do so by "fraud." Mere expressions of opinion as to its value or their ability to sell it, would not charge them; but it was otherwise if "fraudulent representations were made to induce the purchaser to part with his money and such was (sic) calculated to mislead a reasonably intelligent person." The question was whether they had had "a deliberate purpose * * * to defraud." This was enough for the purpose, though somewhat scanty. "Fraud," as colloquially used, implies some kind of cheating, and cheating, ordinarily at any rate, involves deceit. Especially when contrasted, as the language

was, with the right to sell one's own as one chose, the jury could not have been misled as to the essential fact. To be told that opinions or promises are innocent unless made with a deliberate purpose to defraud left open no reasonable doubt that the defendants must have disbelieved the opinions they uttered, and not meant to perform the promises they made. It would indeed have been better to use the language of some of the requests to charge, which put the law more clearly, but these were scattered among one hundred and twenty-four in all, some of them, though which does not appear, inaccessible, because presented just as the charge began. Unless the judge plainly misconceives the structure of the case, or misdirects the jury, requests to charge are of minor importance. In multitude they become an abuse; if counsel insist upon multiplying them unduly, they must be content with summary consideration. We will not reverse a case well tried in the main, by rummaging through a wilderness of verbiage, which serves no other end, however well meant, than to set hurdles for the judge to leap.

■ This concludes all the points which it is necessary to discuss except as to the defendant, Michael Collins, who was convicted only on the conspiracy count. He first raises the point that as to this it must be shown that the conspirators contemplated the use of the mails (Farmer v. U. S., 223 F. 903 [C. C. A. 2]); and that even though he was shown to be concerned in the scheme, it was not proved that by its terms it involved that use. The distinction may at times be important, though not usually. In financial frauds like this where the conspirators contemplate continuous dealings with their victims, it is almost inevitable that they will at times write to them, as here they did. In the case at bar, aside from this, which alone would be enough, the bureaus gathered in the claimants in part by articles in the press, some of which would go through the mails. If Collins was privy to the methods used, which the jury might suppose, he would know this with the rest.

His connection with the conspiracy within three years of the finding of the indictment requires a further statement of facts. Until October, 1925, Lyons and Jerome Collins used only the Equitable Construction Company, with which Michael Collins was connected, to dispose of real estate. Later, when all of its land had been disposed of, Rowe formed a second company, which in turn was used. The evidence was amply sufficient to implicate Michael Collins in the sales of the Equitable Company, but there was nothing to show that he had part in any others, and indeed there was testimony that he had not. As the indictment was found on June 28, 1929, more than three years later, the question comes up of the statute of limitations. In answer the prosecution proved the following facts: One, Frank, had bought plots of the Equitable Company in April, 1925, for which he paid in installments, extending for more than a year, the last being in July and August, 1926. Frank was not called, and it did not appear directly that he was one of the victims of the scheme. However, as we have said, the system had been for the bureaus to send the claimants to the land holding companies to buy lots in settlement of their claims, and Michael Collins was concerned in the sale of no land for the Equitable Company except to persons so referred to it by the bureaus. Frank like the others had originally gone to the bureaus, which recommended him to the Equitable Company, of which he bought. Moreover, it was the practice to divide the net profits into five parts of which Michael Collins got a fifth, the cost of the lots to the Equitable Company being first deducted. On July 29, 1926, he got a cheque from the company of $122.50, which was a part of the installments paid by Frank. It did not directly appear that this was a fifth of any sum then divided, but the practice just mentioned permitted this inference; certainly it was part of the Frank money.

■ From this evidence a jury might conclude that Frank had gone to the bureaus in response to solicitation from them, according to their practice; that they had sent him to the Equitable Company to buy lots which were to be in settlement of his claim, and that Collins, who shared in the usual way in the profits from these lots, had been implicated in this sale. The bureaus were engaged only in the supposititious settlement of claims; customers did not come to them to buy land. Collins and the Equitable Company had not sold stock to any of their customers, except that in one case Kliefeld had done so, at the beginning of his connection with the scheme. So far as appears Frank had no claim against them. To excuse Collins as to this transaction we must suppose that, having come to the bureaus to settle a claim, Frank was sent to the Equitable Company to buy land as an independent venture. This is too unlikely to be taken seriously. True, it was not shown that any of the defendants had

overvalued his lots, or told him that they would be quickly sold, but Collins, or the Equitable Company, must have posed as persons settling his claim. Moreover, since Frank paid some four thousand dollars for the lots and this was divided among the conspirators, it is again most probable that he had been told that their value was that much, plus the amount of his claim. The transaction cannot be broken from the series of which it bore so many of the indicia, and treated as though it stood alone. Almost certainly it was only an instance of the usual dealing, and if the jury thought so, that was enough, for any modicum of doubt is for their sole determination. Thus his division of the profits on July 29, 1926, was in pursuance of the conspiracy, quite independently of whether the affirmative proof was enough without it to dissociate him from the others after October. The evidence as to an earlier cheque for $62.50 is not so strong, but it was competent against him, and at least tended to confirm the inferences to be drawn from the later. The indictment was found in season.

Judgments affirmed.